FILED
2012 Sep-21  AM 09:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JONATHAN W. PELHAM** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:11-CV-01354-KOB** |
| **MICHAEL ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 28, 2008, the claimant, Jonathan Pelham, applied for disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI. The claimant alleges disability commencing on March 23, 2008. The Commissioner initially denied the claim. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on December 1, 2009. (R. 26). In a decision dated January 12, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for both disability insurance benefits and supplemental security income. (R. 19). On February 23, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issue[1] for review:  whether the ALJ improperly applied Social Security Ruling 82-59 in denying the claimant's claims for "failure" to follow prescribed treatment.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the

---

[1] Although the claimant presents other issues, because of the court's ruling on this issue, the court need not address other issues raised.

record in its entirety and take account of evidence that detracts from the evidence on which the ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988); 20 C.F.R. § 416.930(b). For an ALJ "to deny benefits on the ground of failure to follow prescribed treatment, [he] must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored." *Dawkins*, 848 F.2d at 1213. Moreover, "when an ALJ relies on noncompliance as the sole ground for the denial of disability benefits, and the record contains

evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment." *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003); *see also Dawkins*, 848 F.2d at 1214. Poverty excuses a claimant's failure to follow prescribed medical treatment. *Dawkins*, 848 F.2d at 1213.

The ALJ is further bound by Social Security Ruling 82-59. SSR 82-59, 1982 WL 31384, *1 (1982). Under SSR 82-59, an ALJ must first decide whether a claimant would "otherwise be found to be under a disability . . . ." *Id.* Then, the ALJ must determine if the treatment prescribed by a treating source would restore the individual's ability to work. *Id.* Finally, the ALJ must analyze whether the failure to follow that prescribed treatment is justified. *Id.*

Additionally, SSR 82-59 describes the criteria necessary for a finding of failure to follow prescribed treatment. *Id.* An individual's inability to afford prescribed treatment that he is willing to accept is a justifiable cause for failure to follow prescribed treatment. *Id.* at *3-4. However, "[a]ll possible resources (e.g., clinics, charitable and public assistance agencies, etc.) must be explored. Contacts with such resources and the claimant's financial circumstances must be documented." *Id.* at *4. However, "[t]he burden of producing evidence concerning unjustified non-compliance is on the Secretary." *Dawkins*, 848 F.2d at 1214, n. 8. If the ALJ concludes that an individual does not have a good reason for failing to follow prescribed treatment, the ALJ must inform the individual of this fact before a determination is made. 1982 WL 31384, at *4. The individual must also be afforded "an opportunity to undergo the prescribed treatment, or to show justifiable cause for failing to do so." *Id.*

In evaluating pain and other subjective complaints, the Commissioner must consider

4

whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

## V. FACTS

The claimant was thirty-six years old at the time of the administrative hearing and has a ninth grade education. (R. 28, 32). His past work experience includes employment as a security guard, bulk loader, cleanup worker, tree pruner, tire installer, poultry packer, and carpet layer. (R. 42). According to the claimant, he became disabled on March 23, 2008, due to diabetes mellitus, blurred vision, frequent urination, fatigue, and high blood pressure. (R. 199). Since that date, the claimant has attempted to work as a security guard, but his earnings for this job were below the minimum amount required to constitute substantial gainful employment. (R. 12).

On October 15, 2007, Dr. Alex Penot admitted the claimant to the emergency room at Parkway Medical Center to treat his blurred vision. Dr. Penot diagnosed the claimant with new onset diabetes due to his high blood sugar level of 600. The radiology report indicated that the claimant's lungs were underinflated, and his heart size and pulmonary vasculature were at the upper range of normal. Dr. Penot prescribed lisinopril for hypertension in relation to diabetes, as well as metformin and glipizide. (R. 260-264).

Beginning in October, 2007, and continuing through April, 2008, Dr. Adnan Seljuki at Highlands Internal Medicine, LLC, acted as the claimant's primary care physician. (R. 265-286).

5

Dr. Seljuki prescribed several medications for the treatment of the claimant's diabetes, but consistently classified the claimant's diabetes as uncontrolled. (R. 268, 272, 276, 280, 285). Dr. Seljuki also noted that the claimant had a history of medical non-compliance. (R. 268, 272). Dr. Seljuki's records indicated the claimant was a moderate tobacco user, smoking at least one pack of cigarettes a day. (R. 267, 271, 275, 279, 283).

Over several months in 2008 and 2009, the claimant often visited the emergency room at Parkway complaining of ailments related to his diabetes. (R. 224, 248, 238, 311, 327, 354, 376, 391, 408, 419, 445, 475, 483). On March 30, 2008, the claimant entered the emergency room at Parkway Medical Center complaining of hyperglycemia. The claimant informed his emergency room physician, Dr. Sanjiv Chatterji, that he had been without medication for three weeks because he could not afford it. His glucose level was 437. The claimant received instructions to follow up with Dr. Seljuki to obtain affordable medications. (R. 247-250). Again, on April 2, 2008, the claimant entered the Parkway emergency room complaining of high blood sugar. (R. 239). Although the claimant stated he had been taking his medication and watching his diet, his glucose level was 470, well outside the normal range of 74-106. (R. 244). The claimant was discharged after receiving eight units of insulin through IV. (R. 242).

On July 1, 2008, the claimant visited the emergency room complaining of chest pain. (R. 311). His glucose level was 86. Upon discharge, he stated that his pain was better after medication. (R. 312). On August 20, 2008, the claimant entered the emergency room again complaining of chest pain. (R. 327). His glucose level was 131, and his radiology report indicated no acute cardiopulmonary abnormality. (R. 333, 334). He received instructions to follow up with Dr. Seljuki for further evaluation and treatment, and to take his medications as

6

directed. (R. 325). On September 4, 2008, Dr. Seljuki admitted the claimant to Parkway with complaints of left-sided weakness, although Dr. Seljuki noted that these symptoms are likely secondary to psychiatric issues. Dr. Seljuki also noted the claimant's depressive state was due to stress caused by socio-economic problems. (R. 341, 342). The claimant's glucose level was 83, and he was discharged after two days of observation indicated he had not had a stroke. (R. 342, 344). On September 10, 2008, the claimant visited the emergency room at Parkway complaining of numbness and tingling in his left arm and face. (R. 355). The claimant's glucose level was 80. (R. 359). He was discharged with instructions to follow up with Dr. Seljuki in two days and to begin taking new medications as prescribed. (R. 351).

On February 23, 2009, the claimant entered the Parkway emergency room complaining of numbness and tingling in his hands and legs. (R. 377). The claimant's glucose level was 123. (R. 385). He was discharged and instructed to continue with his current medications. (R. 375). On April 9, 2009, Dr. Seljuki admitted the claimant to Parkway with pneumonia. His glucose level was 176, although the discharge summary indicated the hospital used subcutaneous insulin to control his diabetes. (R. 365, 369). On April 13, 2009, the claimant returned to the Parkway emergency room complaining of chest pain. (R. 391). The claimant's glucose level was 185, and he denied any shortness of breath or numbness or tingling. (R. 392, 399). He received Aspirin and was told to follow up with Dr. Seljuki the next day. (R. 400, 402).

On May 26, 2009, the claimant entered Parkway's emergency room complaining of hypertension, as well as tingling in his left arm and chest. (R. 415). After receiving medication, the claimant reported his pain was completely relieved and he was discharged. (R. 408). On June 5, 2009, the claimant returned to the emergency room complaining of syncope. (R. 418). The

7

claimant's glucose level was 77. (R. 433). He was discharged after an IV saline solution was administered with instructions to rest and increase his intake of fluids. (R. 421).

On June 7, 2009, Dr. Kamaledin Kamal admitted the claimant to the hospital due to infectious colitis and acute renal failure secondary to dehydration. He was given intravenous fluids and antibiotics, and discharged after three days. (R. 437). On September 9, 2009, the claimant entered the emergency room at Parkway complaining of chest pain and his glucose level was 156 (R. 483, 490). Upon discharge, he received instructions to follow up with one of the clinics listed on his discharge instructions. (R. 490, 495). On October 10, 2009, the claimant returned to Parkway's emergency room complaining of hyperglycemia and stating that he had been out of insulin for two days. The hospital records indicated the claimant had stopped smoking in May, 2009. (R. 475). His glucose level was 667. (R. 481). He received insulin and was discharged that same day. (R. 479).

On December 17, 2009, Dr. Will Crouch admitted the claimant to Hartselle Medical Center with complaints of chest and abdominal pain. The claimant stated he owed Dr. Seljuki money and had not been able to pay him, which prompted Dr. Seljuki to "release" him. (R. 501). Dr. Crouch further noted that the claimant was unable to buy his medication and had been out of insulin and other medications for 48 hours. However, Dr. Crouch inconsistently went on to note that the claimant had apparently been taking one of his medications, metformin, as prescribed. (R. 501, 504). However, the claimant had stopped taking another medication, Neurontin, due to cost. His glucose level was 802 at the time of admission, but dropped to 280 when he was discharged on December 18, 2009. (R. 504, 509).

On February 26, 2010, the claimant's new primary care physician, Dr. Rupa

8

Shivalingalah, first examined the claimant, finding that he had been out of diabetic medication

for two weeks. However, the claimant had no other complaints at this visit. (R. 569). Dr.

Shivalingalah further noted that the claimant was not smoking at this time. (R. 570). On August

24, 2010, Dr. Shivalingalah noted that the claimant had recently been hospitalized for

uncontrolled blood sugars, but was unsure if the claimant was compliant with his medications.

(R. 565). At the time of this visit, Dr. Shivalingalah indicated that the claimant had started

smoking half a pack of cigarettes per day and exercised through daily activities. (R. 570). On

November 9, 2010, the claimant returned to Dr. Shivalingalah needing refills on many of his

diabetic medications. (R. 561).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance and

supplemental security income, the claimant requested and received a hearing before an ALJ on

December 1, 2009. (R. 10). At the hearing, the claimant testified that the conditions preventing

him from working were peripheral neuropathy and chronic fatigue associated with his diabetes.

(R. 43). He testified that on a regular day he can only sit for 30-35 minutes before needing to

stand up. He also testified that he can only stand up for about 30 minutes before needing to sit

down. (R. 47). The claimant further stated that his diabetes caused his vision to become blurry

and caused him to make frequent trips to the bathroom, sometimes twice an hour. (R. 53, 54).

The claimant testified that when his doctor initially diagnosed him with diabetes, his wife

and family helped him to pay for his medication. However, he testified that he later became

unable to afford his medicines and, therefore, stopped using them, relying instead on frequent

emergency room visitations. He testified that Dr. Seljuki stopped seeing him due to his inability

9

to afford treatment and pay his medical bills. (R. 55, 56).

The claimant's wife, Rosemary Pelham, testified that the claimant's medication is expensive and she could not afford to purchase both insurance and the medicine. She further stated that the claimant had his medicine on a regular basis for the two months prior to the hearing, but his blood sugars remained high. She went on to explain that she changed the claimant's diet to try to control his blood sugars. She also testified that the claimant could only work in the garden for two or three hours before needing to stop for the rest of the day; that he often complained of his hands being tingly; and that he sometimes needed a cane to help him walk. She went on to describe the claimant's forgetfulness and inability to perform certain household chores. (R. 63-67).

A vocational expert, Ms. Bramlett, testified concerning the classification of the claimant's past work experience. She classified the claimant's security guard job as a low semi-skilled, light job. She further classified the exertional levels of the claimant's other work history as medium to very heavy. (R. 41-43). In response to the claimant's attorney's questions concerning the claimant's alleged inability to stand and walk for extended periods of time, Ms. Bramlett testified that these limitations could affect the medium, heavy, and very heavy exertional level jobs more so than they would the light job. She further testified that the claimant's need for frequent bathroom visits could be considered excessive, which would preclude the claimant from working in any job. (R. 71).

*The ALJ's Decision*

On January 12, 2010, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 19). First, the ALJ found that the claimant had not engaged in

substantial gainful activity since the alleged onset of his disability. Next, the ALJ found that the claimant's insulin dependent diabetes and diabetic neuropathy qualified as severe impairments; he concluded, however, that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 12-13).

The ALJ next considered the claimant's subjective allegations of pain to determine whether he had the residual functional capacity to perform past relevant work. The ALJ found that the claimant has severe underlying impairments, but that the "objective evidence does not confirm either the severity of the claimant's alleged symptoms arising from his/her medically documented conditions, or that those conditions could reasonably be expected to give rise to the symptoms alleged by the claimant." (R. 13-14).

To support his conclusion, the ALJ referenced the medical history of the claimant. The ALJ noted that no objective medical evidence in the record supported a "definitive diagnosis of congestive heart failure . . . ." The ALJ determined that the claimant's problems stemmed from his "noncompliance with medication instructions, although dietary and other factors may be involved in the lack of diabetes control." Moreover, the ALJ stated that if the claimant follows instructions, "he does well and his blood sugar remains under good control." (R. 17).

The ALJ noted that the claimant "continues to engage in a wide range of daily activities." (R. 18). These activities included working in a rose garden two hours a day for three consecutive days, washing dishes, sweeping floors, doing laundry, and shopping in a large store. The ALJ determined that the claimant's testimony that he still drove his car was inconsistent with testimony that the claimant has concentration problems. The ALJ at several points noted that, at the hearing, the claimant's hands were stained with ground-in dirt, indicating the claimant's

ability to perform some degree of light work. Based on these findings, the ALJ concluded that the claimant should be capable of performing his past work as a security guard, a low semi-skilled light job, and, therefore, is not disabled under the Social Security Act. (R. 18, 19).

The ALJ also found the claimant's arguments alleging inability to afford medication unconvincing. The ALJ noted that the claimant had "received information of available resources including the Community Free Clinic . . . ." (R. 17). However, the Free Clinic denied medication assistance because the claimant's wife earned too much, indicating to the ALJ that the Free Clinic's development of the resources available to the claimant showed an ability to afford medication. (R. 17-18). The ALJ went on to indicate the claimant had not visited the county health department, another community health resource. Additionally, the ALJ noted the claimant's wife's employer provided medical insurance, but she could not afford it because she bought his insulin. The ALJ concluded that these facts indicated the claimant's failure, without justifiable cause, to follow prescribed treatment, as required by Social Security Ruling 82-59. (R. 18-19).

## VI. DISCUSSION

The claimant argues that the ALJ improperly found that the claimant failed to follow prescribed medical treatment. This court agrees and will reverse and remand this case for proper application of the law and proper consideration of the evidence.

Eleventh Circuit law establishes that failure to follow prescribed medical treatment without a good reason precludes a finding of disability. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). However, the Circuit has recognized that the inability to afford medication or treatment excuses non-compliance. *Id.*; *see also Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th

Cir. 2003). If an ALJ denies benefits based on a failure to follow prescribed medical treatment, the ALJ must find "that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored." *Dawkins*, 848 F.2d at 1213. If the ALJ denies benefits solely on the grounds of non-compliance, the ALJ "is required to determine whether the claimant was able to afford the prescribed treatment." *Ellison*, 355 F.3d at 1275.

Social Security Ruling 82-59 provides further guidance on the issue of failure to follow prescribed treatment. SSR 82-59, 1982 WL 31384, *1 (1982). When an ALJ finds a claimant to be under a disability, then he next must determine if a treatment prescribed by a treating source would restore the claimant's ability to work. *Id.* The ALJ then must analyze whether the failure to follow that prescribed treatment is justified. *Id.*

In the instant case, the ALJ's reasoning for his finding that the claimant is not totally disabled is ambiguous. When discussing the claimant's ability to afford medication, the ALJ cited to SSR 82-59. Under SSR 82-59, if the ALJ determines that the claimant would otherwise be found to be disabled, but has failed without justifiable cause to follow treatment, then the ALJ can deny the claimant's disability claims. By citing to this provision, the ALJ *indicated* he might otherwise find the claimant to be disabled, but did not make that *explicit* finding.

Also, the claimant testified that even when he is compliant with his medications, his glucose level remains high. The ALJ seemingly disregarded this testimony when he summarily stated in his decision that "[w]hen the claimant follows instructions, he does well and his blood sugar remains under good control." (R. 17). On numerous occasions, the claimant entered the emergency room with complaints associated with his diabetes, only to find his glucose level was within normal limits. Again, the ALJ disregarded this evidence when he found that the claimant

13

was able to perform his past relevant work "provided his blood sugar is controlled." (R. 19). The ALJ went on to state that "[w]ith medical compliance, the claimant should be able [to] maintain work." (R. 19). These statements indicate that the ALJ's determination relied on the claimant's noncompliance with prescribed treatment as grounds for the denial of disability benefits without considering the full range of medical evidence.

However, at other points in the opinion, the ALJ completely disregards the issue of the claimant's non-compliance. The ALJ notes that the claimant engaged in a wide range of daily activities even when he failed to take insulin. Twice, the ALJ summarily states that the claimant should be capable of performing his past relevant work. These statements stand in stark contrast to those previously discussed. Thus, this court cannot determine whether the ALJ considered the claimant disabled, but noncompliant with medication (and, thus, *not* disabled); disabled, but dependent on medication (and, thus, actually disabled); or simply not disabled.

Additionally, the ALJ in this case neglected to follow several procedural requirements mandated by SSR 82-59. The ALJ indicated in his opinion that if the claimant was compliant with his medications, he should be able to maintain work. However, during the hearing the claimant testified that he could not afford his medications. SSR 82-59 requires an ALJ to appropriately develop the record to resolve whether the claimant is justified in failing to follow the prescribed treatment.

This court finds that the ALJ failed to develop an adequate record. During the hearing, the ALJ did ask the claimant if he had anyone to help him pay for his medications. The ALJ also asked the claimant if he had considered going to the Department of Vocational Rehabilitation to obtain his medication. However, the ALJ never asked the claimant for documentation of his

14

financial circumstances, as mandated by SSR 82-59. Moreover, the ALJ mentions the county health department in his opinion, but failed to ask the claimant if he had attempted to go there to obtain medication. The ALJ did not document contacts with all possible community resources, as required by SSR 82-59. Additionally, before the ALJ made his determination concerning the claimant's lack of a justifiable reason for failing to follow prescribed treatment, SSR 82-59 required him to inform the claimant of this fact and afford the claimant an opportunity to show justifiable cause for failing to follow treatment. The record shows no evidence that the ALJ followed this procedural requirement.

Therefore, in the instant case, the ALJ erred in his application of the legal standard for failure to follow prescribed treatment by failing to clearly indicate whether the claimant was *not* disabled, or *was* disabled and required medication; and by failing to adhere to the procedural requirements of SSR 82-59 to fully develop the record and provide sufficient notice and opportunity to the claimant to prove justifiable cause for failing to follow treatment.

Because the first issue on appeal is meritorious, the court does not need to address any further issues.[2]

_____

[2] However, the court notes that, upon remand, the ALJ should consider several other matters that troubled this court and would also call into question whether substantial evidence supports the remainder of the ALJ's decision: (1) whether the ALJ committed error when he summarily stated that claimant's diabetes and diabetic neuropathy do not rise to the level of severity as contemplated by the Listings, specifically Listing 9.08 at 20 C.F.R. Pt. 404, subpt. P, App. 1, which was in effect at the time of the hearing; and (2) whether the ALJ improperly failed to address any testimony from the claimant, the claimant's wife, and the vocational expert concerning the claimant's frequent need for bathroom breaks, and the vocational relevance of this condition.

**VII. CONCLUSION**

For the reasons as stated, this court concludes that the ALJ failed to apply the appropriate legal standard in SSR 82-59 to assess whether the claimant justifiably failed to follow prescribed treatment. Therefore, the court REVERSES the Commissioner's decision and REMANDS the case for the ALJ to determine whether the claimant is entitled to Disability Insurance Benefits and SSI. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 21st day of September, 2012.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

16